HON. GEORGE MARTIN,
HON. DAVID JOHNSON,
HON. JOSEPH T. COPELAND,
HON. NATHANIEL BACON,  } JUDGES.
HON. SAMUEL T. DOUGLASS,
HON. WARNER WING,

---

THE MICHIGAN CENTRAL RAILROAD Co., complainants, vs. THE MICHIGAN SOUTHERN RAILROAD Co., defendants.

It is provided, by Section 5 of the Charter of the Michigan Central Railroad Company (*Sess. Laws*, 1846, *p*. 43), that no railroad, or railroads, from the eastern or southern boundary of the State, shall be built, constructed, or maintained, or shall be authorized to be built, constructed, or maintained, by, or under any law of this State, any portion of which shall approach, westwardly of Wayne County, within five miles of the line of said Railroad, as designated in said Act, without the consent of said Company; nor that any railroad, or railroads, shall be so authorized, or constructed, which shall commence within twenty miles of the City of Detroit, and extend to Lake

46

Michigan, or the southern boundary line of the State, the line of which shall,
on an average, run within twenty miles of the main line of the said Michigan
Central Railroad. *Provived*, that said section shall not be construed to restrict,
or prevent the construction of public roads, or canals, or railroads, or private
ways, under, above, or across the road of said Company, when deemed expe-
dient; but so as not unnecessarily to obstruct the same. *Held*, that the
prohibition contained in the first subdivision of said section, does not apply
to a chain, or series of railroads, one of which might reach one of the prohib-
ited points, and another of which might reach the other point; but only to
an *entire* road in itself extending to each point.

*Held*, also, that the proviso at the end of the section was not limited in its terms
by the general language of the first subdivision, and that its intent was not
to prohibit the construction of such roads only as did not connect with said
southern or eastern bouundary.

This was an appeal from the Circuit Court for the County
of Wayne, in Chancery.

The bill of complaint set out, among other matters, the
incorporation of complainants, their purchase of the Michi-
gan Central road, and that by the fifth section of their
charter (*Session Laws*, 1846, *page* 43), the State intended to
guaranty and protect them from being encroached upon or
tapped by any other road or roads from the eastern or south-
ern boundary of the State. That, at the time the State deter-
mined on a sale of the Central road, it also determined on
a sale of the Southern road, but that by section thirty-eight
of the Southern Railroad Company's Charter, the sale of the
said Southern road was made expressly dependent upon, and
subordinate to that of the Central road. That, by the charter
of defendants, and an amendment thereof, they were within
a certain time to construct and complete the road from the
village of Tecumseh, by way of Clinton, to the village of
Jackson, by way of Manchester, and along the lines of the
roads formerly authorized to be constructed by the Jackson-
burgh and Palmyra Railroad Company, or so far along the
same as might not conflict with the provisions of an Act
entitled, "An Act to authorize the sale of the Central Rail-

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern Railroad Co., defendants.

road," approved March 28, 1846. That by the Act incorporating the Erie and Kalamazoo Railroad Company, approved April 22, 1833, said Company was authorized to construct a road from Port Lawrence through Adrian, to such point on the Kalamazoo River as they deemed proper. That the said Erie and Kalamazoo Railroad Company became insolvent, and proceedings by *quo warranto* were commenced for the forfeiture of their charter. That the Act of May 18, 1846, amended said charter so as to prevent the extension of its road beyond Adrian, and waived all causes of forfeiture, which amendment was accepted by the Company. That the Southern Company have made such arrangements with said Erie and Kalamazoo Railroad Company, that the former were then regularly running cars upon, and using that portion of the road of the latter which lies between Adrian and Toledo, in Ohio, in connection with their said Southern road, and that their chief business was passing over said Erie and Kalamazoo Railroad, and Toledo had become the principal terminus of said Southern road. That said Southern Railroad Company having constructed a branch of their road from Adrian to Tecumseh, connecting their road with said Erie and Kalamazoo Road, at or near Adrian, had commenced the construction of a continuation of said branch road, to be extended until it should intersect the complainants' road at Jackson, and avowed their intention to construct, maintain, and run said road from Tecumseh to Jackson. That the track of said road runs east from Jackson for over ten miles within five miles of the track of complainant's road, and intersects with it at Jackson. That said road, if constructed, together with the branch from Tecumseh to Adrian, and said Erie and Kalamazoo Railroad from Adrian to Toledo, would, in effect, constitute one road from Toledo to Jackson, and coming from the southerly boundary of the State, to within five miles of

complainant's road at Jackson, tapping and intersecting there-
with, would be a direct violation of the rights and
privileges guaranteed to complainants by their charter. That
it would constitute, in fact, one road from the eastern boundary
of the State to Jackson; and the bill prayed for a perpetual
injunction, restraining the defendants from constructing and
putting in operation said road from Tecumseh to Jackson, or
so much thereof as approaches westward of Wayne County
within five miles of the complainants' road.

The answer of defendants admitted the incorporation of
complainants and defendants; that said section five of the
complainants' charter contains the provision cited in the bill,
but claimed that, in connection with other provisions in the
same section of their charter, it was intended merely to pre-
vent the construction of railroads running across the State
parallel with said Central road, within the prohibited dis-
tance, and terminating at the eastern or southern boundary
of the State. The answer also admitted the running of the
cars of defendant regularly and continuously over the Erie
and Kalamazoo road. It denied that Toledo was the terminus
of the Southern road; admitted the intended construction
of the road to Jackson, and, that for about ten miles, the
route of the same runs within five miles of the complainants'
road. It denied that said Erie and Kalamazoo road from
Toledo to Adrian, said branch from Adrian to Tecumseh, and
said contemplated road from Tecumseh to Jackson, would, in
fact or effect, constitute one railroad from Toledo to Jackson.

No other facts than such of those above recited as are
contained in the bill, and admitted by the answer, need be
stated. The point upon which the case was decided in
this Court, was simply, whether a series of connected roads,
which together formed a line of communication between the
points designated in section five of complainants' charter, viz.:

the southern boundary of the State, and a point within five miles of their road, was within the prohibition of said section. The Circuit Court for the County of Wayne made a decree in accordance with the prayer of the complainants, perpetually enjoining the defendants from constructing and maintaining the projected road ; from which decree the defendant appealed to this Court.*

---

* The views entertained by the Court below, on the point decided by this Court, were fully given in an opinion delivered in November, 1853, on the decision of the complainants' motion for a preliminary injunction, and were as follows :

DOUGLASS, J.—This is a motion for a preliminary injunction, heard upon bill, answer and affidavits.

The bill was filed by the Michigan Central Railroad Company, against the Michigan Southern Railroad Company. Both parties are Corporations, duly organized under charters granted by the Legislature of Michigan.

The complainants own the Michigan Central Railroad, which extends from Detroit westwardly, through the village of Jackson, to New Buffalo, and from thence southwardly across the southern boundary of the State.

. The defendants own the Southern Railroad, which extends from Monroe westwardly, through the village of Adrian, to and across the southern boundary of the State, near White Pigeon; and also the "Tecumseh branch" of that road, which connects with it by means of a switch at a point about five miles east of Adrian, and extends from thence northwardly to Tecumseh. The Erie and Kalamazoo Railroad extends from Toledo northwestwardly across the southern boundary of the State to Adrian, where it connects with the Southern road by means of a switch. It is used in connection with that road.

If the Tecumseh branch were extended from Tecumseh north-westwardly to the village of Jackson, it would, with five miles of the Southern road, and with the Erie and Kalamazoo Railroad, form a continuous and not very indirect line of railroads from the *southern* boundary of the State to the Central road at Jackson. But, with the present connections, these roads could not be used together as one, without backing the trains coming from either terminus of the entire line, over the five miles between Adrian and the junction of the Tecumseh branch, which would be somewhat dilatory, inconvenient, and hazardous. And the Tecumseh branch, thus extended, would, also, in connection with the eastern portion of the Southern road, form a continuous and quite direct line of railroads from the *eastern* boundary of the State to the Central road at Jackson.

The defendants threaten, and are now proceeding to make this extension. They have already procured additional subscriptions to their capital stock for that purpose; have surveyed and located, and let the contracts for grading the entire

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern Railroad Co., defendants.

road between Tecumseh and Jackson, and avow their intention to construct it for the whole distance, as speedily as may be practicable.

The complainants have filed this bill to restrain defendants from constructing any portion of this road within five miles of the line of the Central Railroad. They now move for an injunction to that effect, to stand until the final hearing, or until further order of the Court.

The respective charters of the complainants and defendants were enacted during the session of 1846. At this time the State owned both the Central and Southern Railroads. The former was completed from Detroit to Kalamazoo; the latter from Monroe to Hillsdale.

The charter of the complainants was passed, and took effect on the 28th of March. (*L.* 1846, *p.* 37.) It was entitled, "An Act to provide for the sale of the Michigan Central Railroad, and to incorporate the Michigan Central Railroad Company." It created certain persons therein named, and such others as might be associated with them, a Corporation *in presenti*, with certain limited powers (§ 1), and vested the Corporation thus created (who are the present complainants) with the right to purchase the Central Railroad, and to acquire certain additional powers, privileges and franchises, on payment into the State Treasury of $2,000,000—$500,000 down, and the residue within six months thereafter, which payments were made within the times, and in the manner prescribed.

Section five of this charter contains the following provision, upon which they base their present claim to an injunction: "*And no railroad or railroads from the eastern or southern boundary of the State, shall be built, constructed or maintained, or shall be authorized to be built, constructed or maintained by or under any law of this State, any portion of which shall approach, westwardly of Wayne County, within five miles of the line of said railroad as designated in this Act.*"

The first and principal inquiry is, whether such a railroad, with such connections as the Tecumseh branch, is within the purview of that provision of section five of the complainants' charter, which is above quoted.

That a railroad from Toledo to Jackson would be "a railroad from the southern boundary of the State," admits of no question. It is equally clear that a railroad from Monroe to Jackson, would be "a railroad from the eastern boundary of the State," within the meaning of *eastern boundary* as here used; for the objection that it would not extend to the National and State boundary line in the middle of Lake Erie, is too frivolous to require consideration.

It admits of scarcely less doubt that the Erie and Kalamazoo Railroad, five miles of the Southern road east of Adrian, and the Tecumseh branch are, together, "railroads from the southern boundary of the State;" and that the eastern portion of the Southern road, and the Tecumseh branch, are "railroads from the eastern boundary of the State."

And the clause declares, in terms which cannot be misunderstood, that no such "railroad or railroads" shall approach within five miles of the complainants' road west of Wayne County, without their consent.

It is argued that the provision in question should be construed merely to inhibit the northern extension beyond certain limits, either of *one* single con-

tinuous "railroad" from the eastern or southern boundary—that is, a road the whole line of which is constructed and owned by one Company, or under one charter, *or*, of several *such* "railroads." But such a construction seems to me altogether untenable. It renders "railroads" not merely useless in the sentence, but worse than useless; for, if omitted, the inhibition, in this view of it, would have been equally complete, without any liability to misconstruction. It renders the whole clause practically nugatory, for the design of the inhibition evidently was to secure the complainants against a diversion of business from their road, by the construction of certain other railroads; and that business would be as effectually diverted by two roads, one from Jackson to Adrian, and another from thence to Toledo, as by one road for the whole distance from Jackson to Toledo. It is conceived that the defendants would not be quite satisfied with such a construction if applied to their charter. *That*, in like terms, inhibits any "railroad or railroads" from the eastern to the southern boundary of the State, within a distance of twenty miles of the main line of the Southern road. If the State should charter one road from near White Pigeon to Jonesville, and another road from Jonesville to Monroe, and both roads should be constructed within one mile of their line, it is confidently believed that complainants would think their rights were violated. I think the construction I am now asked to give to the complainants' charter would be manifestly against good faith.

It is also insisted that the construction claimed by the complainants for the provision above quoted from section five of their charter, is inconsistent with the following proviso, contained in the same section: "*And provided also, that this section shall not be construed to restrict or prevent the construction of* public roads or canals, *or railroads* or private ways *under, above, or across the road of said Company, when deemed expedient*, but so as not unnecessarily to obstruct the same." I am unable to perceive any such inconsistency. It will be observed that there is nothing in the complainants' charter which expressly inhibits railroads whose general course is transverse to that of the complainants' from approaching or crossing it, provided they do not extend to, or connect with others which do extend to the eastern or southern boundary of the State. Thus, a railroad from Grand Rapids to Battle Creek, or to Kalamazoo, or from Lansing to Jackson, might intersect, and so might an infinite variety of other roads not only intersect, but cross the Central road, without violating the inhibition in question, or any other. It will be observed also, in referring to another and preceding clause of section five, that it authorized the complainants to *take, have and appropriate to their use* lands for the line of their road. Now, there was a possibility that it might be claimed under this clause, that *no* other company had or could be vested with the right to construct a road across the lands thus taken by the complainants, and which the charter declared they might have and appropriate *for their own use;* at least without making compensation to the complainant. The proviso above quoted was apparently designed to guard against such a construction; and, if fairly construed, with reference to all the preceding enactments, so far as it relates to railroads, I think it must be understood simply to declare that nothing in that section contained should be construed to prevent such roads as

The Michigan Central Railroad Co., complainant, *vs.* The Michigan Southern Railroad Co., defendants.

are not within the previous inhibitions of the section, from being constructed "under, above, or across the road of said Company." I entertain no doubt that such was its intention, and, in this view, it is perfectly consistent with the construction which is claimed by the complainants, for the particular provision now under consideration.

It is still further insisted that the Legislature could not have intended that the provision now under consideration of the fifth section of the complainants' charter, should be applied to such roads as the Tecumseh branch and its connections, because, at the time the complainants' charter was enacted, there were four railroad Corporations in existence, organized under charters previously granted by the State or Territorial Legislature, each of which charters authorized the construction to, or across the line of the Central road, of a road which, either alone, or in connection with other roads, would form a continuous line of railroads from Toledo or Monroe, viz.: the Erie and Kalamazoo Railroad Company, chartered in 1833 (*L.* 1833, *p.* 78), the Jacksonburgh and Palmyra Railroad Company, chartered in 1836 (*L.* 1836, *p.* 318), the River Raisin and Grand River Railroad Company, chartered in 1835 (*L.* 1835, *p.* 5); and the Ypsilanti and Tecumseh Railroad Company, chartered in 1838 (*L.* 1838, *p.* 175). The names of these Companies sufficiently indicate the routes of the respective roads each was authorized by its charter to construct.

When the complainants' charter was enacted, the Erie and Kalamazoo Railroad Company was in existence, but was insolvent; its road, which was constructed from Toledo to Adrian only, was in an extremely dilapidated condition, and proceedings by *quo warranto* were then pending against it to obtain a judgment of forfeiture for alleged violations of its charter.

The charter of the Palmyra and Jacksonburgh Railroad Company provided, that unless they completed the whole road within ten years from its passage, the charter should be void as to so much of it as was not completed. The ten years expired on the very day of the passage of the charter of the complainants, March 28, 1846. The Company had been organized; had procured a loan of $20,000 from the State, and mortgaged its road to the State as security; and had completed, or partially completed its road from Palmyra to Tecumseh only. The State had obtained possession of the road under the mortgage, and now claimed to own it. (*L.* 1845, *p.* 12.) The road had been discontinued from Palmyra to the Southern road (*L.* 1841, *p.* 139). The balance of it constituted what was then, and still is known as the Tecumseh branch of that road. The very provision of the charter upon which the defendants base the rights they now claim to extend this Tecumseh branch to Jackson "along the line of the railroad formerly authorized to be constructed by the Jacksonburgh and Palmyra Railroad Company," furnishes indubitable evidence that the State *claimed* that the charter of this Company was forfeited.

The charter of the River Raisin and Grand River Railroad Company provided, that unless the Company should construct thirty miles of their road within six years from its passage (1835), the charter as to so much as was not completed should be void (§ 4). Nearly eleven years had at this time elapsed, and it is believed that no part of the road had been opened, except a short distance

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern Railroad Co., defendants.

between La Plaisance Bay and Monroe, and that this had been sold to the State. (*L.* 1840, *p.* 53.)

The charter of the Ypsilanti and Tecumseh Railroad Company required the whole road to be completed within four years from 1838, or that the charter should be void as to so much as was unfinished. This time had expired, and no part of the road had been opened. For the further history of this Company, see *L.* 1839, *p.* 253; *L.* 1841, *p.* 219; *L.* 1842, *p.* 26.

None of these charters had ever been judicially declared forfeited.

Now, looking at all the circumstances, we think the fact that such charters were at this time on the statute book, conceding that the three last mentioned were not forfeited without judgment, does not tend to show that the Legislature did not mean what they said, when they declared, in the charter of the complainunts, that no railroad or railroads, from the eastern or from the southern boundary of the State, should be *built or constructed*, or should be authorized to be built or constructed, which should approach within five miles of the Central road west of Wayne connty. The very terms of the inhibition tend to show that these charters were in the eye of the Legislature. From the nature of the case, no railroad of any extent ever can be built, without a law authorizing it, and conferring the requisite power to take private property. If it had not been for these charters, the inhibition would have been perfect if it had merely been declared that no railroad should thereafter be *authorized* to be constructed. And, there being at the time no charter authorizing any such railroads to the line of the Southern road (except the charter of the Erie and Kalamazoo Company, whose road was already in operation to Adrian), this is all that was said in a clause in the charter of the defendants in other respects like this. But here the Legislature went further: as if to provide against the possibility of a renewal of these old charters, they declared that no such road *should be constructed*. They seem to have assumed, either that these charters were forfeited without judgment, or that causes for forfeiture in each case existed, and by these words to have intended to bind themselves to insist upon the forfeiture, at least so far as might be necessary to prevent the construction of either of these roads, within five miles of the road of the complainants.

Another Act of the same session tends to confirm this view. By it the State offered to waive the previous causes of forfeiture of the charter of the Erie and Kalamazoo Railroad Company, if the Company would assent to a repeal of so much of the charter as authorized the extension of their road beyond Adrian (*L.* 1846, *p.* 268)—the time within which they were required to make such extension not having then expired.

It has been argued with great zeal and earnestness that the Legislature could not have intended an act, so injurious to the future welfare of the State, as to divest themselves for a long series of years and forever, perhaps, without purchasing the Central road, or making compensation to the complainants, of the power to construct, or authorize any railroads to be constructed from the southern or eastern boundaries of the State, in northerly or north-westerly directions, which should extend to or beyond the Central Railroad. Courts must judge of the intent of the Legislature by what is declared in their acts. They are not at

47

liberty to set aside the plain and unequivocal words of a statute on any specula-
tion as to the policy which *ought* to have governed its enactment. But if we
look at the state of things existing when this charter was enacted, I think we
shall find little to create a doubt that the Legislature intended what they said
in the complainants' charter. It will be remembered that in 1837 the State
undertook the survey, construction and management of the Central and South-
ern Railroads. Appropriations from the State Treasury were, from time to time,
made in furtherance of these undertakings, until 1846. The Central road, as
has already been stated, was then completed to Kalamazoo, the Southern road
to Hillsdale. The State was burdened with a heavy debt, contracted in the
prosecution of these and other works of internal improvement. The embar-
rassed condition of its finances presented almost insuperable obstacles to the
further extension of either of these roads westward. The speedy completion
of both and (especially of the Central road) to Lake Michigan, was deemed of
vital importance to the public interests, and necessary to secure a profitable
return for the capital already invested in them. Their routes lay through
wealthy and populous counties, in the direction of the main travel and commerce
of the country. The State was desirous to sell them to private corporations, by
whom they might be completed. Certain individuals were desirous of purchas-
ing the Central road, if the terms could be agreed upon. They must have seen
at a glance that two classes of roads might be constructed, which would come
in competition with it, and materially affect its business: namely, through par-
allel roads, which would directly compete with it through its entire line, and
roads approaching it transversely from the eastern or southern boundary of the
State, which might tap any part of its line, and draw off to the southward bu-
siness that would otherwise pass over its eastern portion. Other roads approaching
or connecting with it, would but swell the tide of travel and transportation over
it. It was precisely against these roads that they would naturally ask to be
protected. The negotiations between the State and these individuals resulted in
the charter of the complainants. By means of that charter and its acceptance,
two millions of the indebtedness of the State then pressing upon the energies of
the people was extinguished, and the early renewal and completion of what was
then deemed one of the most important railroads in the State was secured almost
beyond contingency. These benefits were not, and perhaps could not then have
been obtained, without the grant of extraordinary privileges. And when we
find in the charter a provision, in plain and unequivocal language, inhibiting the
approach within five miles of the Central road of any roads from the eastern or
southern boundary of the State, I think it cannot be said, looking at the circum-
stances, that there was any antecedent improbability which should control the
construction of this provision, that, for the sake of these benefits, such a pro-
tection should be granted; especially when we find the Legislature, in the same
charter, carefully guarding, as far as was practicable, against the future hard-
ships which might result from its grant of extraordinary privileges (and none
were more extraordinary or more required to be guarded against than the pro-
tection against competing roads), by a provision limiting tolls; by the reserva-
tion of the right to repurchase after 1867; and to alter, amend or repeal the

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern Railroad Co., defendants.

charter after thirty years. If it had been done, it would not have been the first time in the history of human affairs that a present good had been purchased at the cost of future evils.

❖ &ast; ❖ ❖ ❖ ❖ ❖ ❖ ❖

For the foregoing reasons, I am clearly of the opinion that the complainants, by the above quoted provision of their charter, are vested with the franchise or privilege not to have this Tecumseh branch, or any other railroad, which, itself, or with its connections, extends to the eastern or to the southern boundary of the State, built, constructed or maintained within five miles of the line of the Central Railroad, west of Wayne County, without their consent."

His Honor then proceeded to state his opinion that this charter, from the day of its enactment, was an executed contract between the State and the complainants, and that the State was deprived of all power to alter or modify it (except so far as the power was reserved by the charter itself), by that provision of the Federal Constitution, which declares that no State shall pass any law impairing the obligation of contracts; and, that, although in the exercise of the sovereign right of eminent domain, the franchise in question might, like other property, be taken or condemned for public use; yet, that this could not be done except by a law clearly authorizing it to be so taken, and providing a mode in which the damages should be appraised and compensation made to the complainants.

His Honor then referred to that provision of the sixth section of the charter of the defendants, which required them to "extend, construct and complete the Tecumseh branch, from the village of Tecumseh, by way of Clinton, *to the village of Jackson,* by way of Manchester, and along the line of the railroads formerly authorized to be constructed by the Jacksonburgh and Palmyra Railroad Company, *or so far along the same as may not conflict with the provisions of 'An Act to authorize the sale of the Michigan Central Railroad Company, approved March* 28, 1846.'" And, not being able to find any provision of the complainants' charter, with which the construction of the Tecumseh branch to Jackson, on the line designated would conflict, except the provision above quoted; and, being of the opinion that the extension of said road beyond a point five miles distant from Jackson, would conflict with that provision unless the complainants consented to it, arrived at the conclusion, that, although the language was ambiguous, it was not designed to require the defendants to construct the road to Jackson, unless the complainants consented.· [When this opinion was given, it did not appear in the case, that, for a short distance, the route of the "Jacksonburgh and Palmyra Railroad," as surveyed, was the same as that of the Central Railroad.]

His Honor then examined, in detail, those provisions of the defendants' charter which authorized the taking of property for the use of their road, and provided for the mode in which the damage should be ascertained, and compensation made, and arrived at the conclusion that they were altogether inadequate and inapplicable to such property as the franchise claimed by the complainants. His Honor then added in conclusion: "For the foregoing reasons I am clearly of the opinion that the defendants are not authorized by their charter to construct the Tecumseh branch to Jackson without the consent of the complainants.

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern Railroad Co., defendants.

*C. I. Walker, Baker & Millerd,* for appellants.

*Van Dyke, Frazer & Gray,* for appellees.

By the Court, MARTIN, J.

By the Act creating and incorporating the complainants, such complainants were authorized to purchase within a prescribed time, and upon certain terms, the Michigan Central Railroad; and upon such purchase was required to complete the construction of said road from Detroit to some point on or near Lake Michigan, in this State, and thence on to the southern boundary of the State.

By the Act incorporating the Michigan Southern Railroad Company, such Company was authorized upon certain terms and within a certain time, but contingently upon the purchase of the Central road by the complainants, to purchase the Michigan Southern Railroad, with all its appurtenances, including the Tecumseh branch, and all rights of way for a railroad between Tecumseh and Manchester, and was required to extend and complete such branch to Jackson, as well as to complete the Southern road to Lake Michigan. (*See Session Laws of* 1846, *pp.* 37 *and* 170.) Under this latter charter, the defendants are proceeding to complete the Tecumseh branch to Jackson, and the complainants, claiming

---

Entertaining these views as to the rights of the respective parties, and considering the case free from doubt, it is clearly my duty to grant the present motion. It was held by the Lord Chancellor in The River Dun Navigation Company *vs.* The North Midland Railway Company (1 *Railway Cases,* 135), that where it was clearly shown that a Corporation was exceeding its powers, in violation to the rights of others, a Court of Chancery could not refuse to interfere by injunction. And this is in accordance with the current of the modern decisions. (*Agar* vs. *The Regents Canal Company,* Coop. *R.,* 77; *The Manchester, etc. Railroad Company* vs. *The Great Northern Railway Company,* 12 *Eng. Law & Eq. R.,* 216; *The Enfield Toll Bridge Company* vs. *The Hartford and New Haven Railroad Company,* 17 *Conn. R.,* 66; 2 *Waterman's Ed. on Inj.* 372, *et seq., and cases there cited*)."

Motion granted.

that such extension will be in derogation of the rights secured
to it by the provisions of the fifth section of its charter, seeks
by this bill to restrain them from completing and putting in
operation so much thereof as shall approach within five miles
of the Central road.

The provisions of the fifth section, upon which the com-
plainants rely, is the following : "And no Railroad or Rail-
roads from the eastern or southern boundary of the State,
shall be built, constructed or maintained, or shall be authorized
to be built, constructed or maintained, by or under any law of
this State, any portion of which shall approach, westwardly
of Wayne County, within five miles of the line of said Rail-
road, as designated in this Act, without the consent of said
Company ; nor shall any Railroad or Railroads be so autho-
rized or constructed, which shall commence within twenty
miles of the City of Detroit, and extend to Lake Michigan,
or the southern boundary line of this State, the line of which
shall, on an average, run within twenty miles of the main
line of said Michigan Central Railroad : *Provided*, that
nothing herein contained shall be construed to preclude or
prevent the construction of the Southern Railroad from Lake
Erie to Lake Michigan on the line therefor, heretofore des-
ignated by the laws of this State, or anywhere further south-
ward of said line : *and provided also*, that this section shall
not be construed to restrict or prevent the construction of pub-
lic roads or canals or Railroads, or private ways, under, above
or across the road of said Company, when deemed expedient,
but so as not unnecessarily to obstruct the same," etc.

That such branch cannot be extended to Jackson, without
approaching within five miles of, and virtually up to the line
of the Central road, will not be denied, and the single ques-
tion presented in this case is, whether such extension be
within the inhibition of the complainants' charter.   Our first
inquiry, then, is necessarily, what this protection to the

complainants is, which is claimed to be an inhibition upon the extension of the branch to Jackson.

The construction of this provision of the complainants' charter has, to a very great extent, employed the time and taxed the ingenuity of the counsel for both parties, yet we apprehend that a careful examination will enable us, satisfactorily, to interpret it so as to give effect to the Legislative intention, to preserve the rights of parties, and to consist with sound public policy. At the time of the passage of their charter, it was the desire and the settled policy of the State to sell, if practicable, all its works of internal improvement, and relieve itself from the burdens and responsibilities attending their prosecution, as well as from the debt it had incurred upon their account. In addition to the Central and Southern roads running from the eastern boundary, and which were being constructed by the State, charters were in existence, authorizing the construction of various other Railroads, running, some from the eastern and some from the southern boundary, towards, up to, and across the Central road. Under some of these charters, the work had been commenced, while under others, nothing had been done. Whether any, and which of these charters were yet valid, and which was extinct, and what were the rights of the corporators, were questions which would naturally be suggested to the minds of those proposing to purchase these roads, and those questions were more easily and satisfactorily disposed of, by provisions protecting the purchasers from the construction of these chartered roads, than by an investigation into the condition of each, or by judicial proceedings instituted for their forfeiture. It was also desirable, that no other roads should be authorized to be constructed in the same direction with those thus disposed of, and by these means the purchasers would be protected from injurious competition, and from a diversion of business from their line

without their consent. Hence, we find much the same pro-
visions in both charters. For these purposes, among others,
the provisions referred to were inserted in the complainants'
charter. Whether, and how far, these purposes have been
accomplished, and their object attained, must be determined
by the language employed, as it is a well-settled rule, that
public grants are to be construed strictly, and that nothing
is to be taken by implication as against the public, or in
favor of monopolies, and in abridgement of public or common
rights.

The protection secured to the complainants, is : 1. Against
the construction, maintenance, or authorization of *any Rail-
road running from the eastern or southern boundary of the
State, any portion of which* shall approach westwardly of
Wayne County, within five miles of the *line* of the Central
road, *as designated in the charter*, without the consent of the
complainant ; and, 2. Against the authorization or construc-
tion of any road which should commence within twenty miles
of Detroit, and extend to Lake Michigan, or the southern
boundary line of the State, and *the line* of which should, on
an average, run within twenty miles of the *main line* of the
Central road. These roads contemplated in, and inhibited
by the first subdivision, are clearly such as shall intersect, or
extend from the eastern or southern boundary of the State,
and not such as shall be constructed from intermediate points,
and which may *approach within five* miles of the line of the
Central road, which was designated in the Act. Now, by a
reference to the Act (*Section* 5), it will be seen, that the
*designated line* extended only to Kalamazoo, and that beyond
this point it was to be designated and located by the com-
plainant. Hence, the second subdivision, inhibiting *through*
parallel roads, or those extending from a point within twenty
miles of Detroit to Lake Michigan, or the southern State
boundary, *the line* of which might, *on an average*, run within

twenty miles of the *main line* of the Central road. This is
made apparent by the. *proviso*, that nothing therein con-
tained should be construed to prevent the construction of the
Southern Railroad on the line which had already been
designated by law, or anywhere further southward of that
line. What the line of the complainants' road west from
Kalamazoo might be, was unknown, and its designation,
might be such as to bring it within twenty miles of, or even
across the line of the Southern road as designated by law ;
and to obviate the consequence of such a designation by the
complainant, and the necessity of a change of the line of the
Southern road (which yet was, and might continue to be the
property of the State), this proviso was inserted. So again,
this is apparent from the consideration of the fact, that a
road from the eastern or southern boundary, while some por-
tion of it might *approach* within five miles of the line of the
Central road, might not at all run on an average of twenty
miles of its *main line;* while one, commencing within twenty
miles of Detroit, and extending to Lake Michigan, might run
within that average distance ; and so might one running to
the *southern boundary*, if its course were westwardly, but
not otherwise. It can hardly be doubted, either, from an
examination of the Act, that the protection of Detroit from
the consequences which might result from the termination of
roads within a distance of twenty miles, entered largely into
the consideration of the Legislature in framing this latter
prohibition.

The branch in question, not being a parallel road, comes
within the prohibition of the first subdivision, if it shall be
found to be within either. It is contended, on behalf of the
complainant, that this inhibition extends as well to " series of
roads," or lines which, by their connections, may reach the
proscribed limits, as to continuous roads ; and it is upon this
foundation that the whole claim of the complainants rests.

So far is this claim urged, that the *proviso*, that nothing in the section shall be construed to restrict or prevent the construction of public roads, or canals, or railroads or private ways under, above or across the complainant's road, when deemed expedient, but so as not unnecessarily to obstruct it, is claimed to be limited in its terms by the general words of the prohibition (a' claim which has at least the merit of novelty to recommend it), and that such cross roads can only be built as do not connect with the southern or eastern boundary.

But we apprehend that the language employed will not authorize such a construction. If, in the interpretation of this Act, words are to be deemed to have been used in their ordinary sense (and this is the well-settled rule for the construction of laws, when a contrary intention does not expressly appear), we can attach to the expression "railroad *or* railroads" no signification which would embrace a series or connection of roads, one of which might extend to the one proscribed limit, and another reach to the other proscribed limit, because : 1. These words are employed as convertible, and are used in the ordinary form of legislative language for abundant caution, and no extraordinary signification is indicated. 2. Because such as run from a designated point, viz.: the southern or eastern boundary are mentioned, and not such as might be constructed from other or intermediate points ; and, 3. Because the phrase " *any portion of which,*" has a singular sense, and relates to each road which may run in the prohibited direction, and cannot, without gross violence to language, be construed to apply to one of a series, as the word " which" has for its antecedent such road or roads as are described as commencing at a designated point ; nor, for the same reason, can the phrase be construed to signify " any portion of either of which," or " any portion of any one of which," without the aid of implication ; and to this, except in the last necessity, we cannot resort to determine

48

the franchises of a Corporation. If the Legislature had had in contemplation the prohibition of all lines of railroads which could or might, through their connections with each other, or with other roads, approach within five miles of the complainants' road on the one hand, and to the eastern or southern boundary line of the State on the other, words would have been employed which would clearly indicate such an intention: words which would prohibit the approach of any one of the chain, and not such as import in their ordinary use entire roads.

It is reasonable to presume, that the Legislature carefully weighed and duly considered the import of the language employed in this charter. The nature of the claim put forth by the complainants under the interpretation sought, and the extraordinary powers and immunities demanded, and which must be conceded if such interpretation be correct, furnish abundant evidence that such a prohibition was never contemplated nor created. The eastern boundary of this State is not limited to the little space between Detroit and Monroe, nor is the prohibition in the Act confined to roads running from the eastern boundary within those points. From the Straits of Mackinaw to the Maumee Bay this line extends from which, under this construction, no road or roads can be built which shall approach within five miles of the Central road, nor cross it (for such is the claim of counsel) without the complainants' consent. If the *construction* contended for by the complainant be the true one, then no road from the northern or southern portion of the State can, while this charter exists unchanged, be constructed which may reach or cross the Central road, and intersect, or even cross any road which may be constructed from any point of this eastern boundary line. The consequences of such an interpretation of the Act (to which we shall again allude) are too momentous, and would indicate such gross ignorance or

disregard of the public interests, as to forbid the conclusion that any such design was entertained by the Legislature, or contemplated by either party to the charter.

Our next inquiry is, what are the defendants threatening to do, and under what authority? By the *fifth* section of its charter, the Michigan Southern Railroad Company was authorized to locate, construct and maintain a railroad, "from the junction of the Tecumseh branch with the Southern Railroad, to pass through the villages of Tecumseh and Clinton to the village of Manchester, in the County of Washtenaw;" and by the *sixth* section the said Company was required within a certain time "to extend, construct, and complete the Tecumseh branch from the village of Tecumseh by way of Clinton to the village of Jackson by way of Manchester, and along the line of the railroads formerly authorized to be constructed by the Jacksonburgh and Palmyra Railroad Company, and so far along the same as may not conflict with the provisions of the Act" incorporating the complainants. From the pleadings and proofs, and from the stipulations of parties, and the contemporaneous history to which reference has been made (and to which our limited space will only permit an allusion), it appears that the Tecumseh branch is a part of what was originally the Jacksonburgh and Palmyra Railroad, and which at Palmyra connected with the Erie and Kalamazoo Railroad. Before the creation of the complainant's charter, however, so much of the Jacksonburgh and Palmyra road as extended south of the Michigan Southern Railroad had been discontinued, and that north of this latter road had become the property of the State. It had only been constructed to Tecumseh, but the purpose of extending it to Jackson had never been abandoned. This branch then was a public work, as much as the Central and Southern roads, and the faith of the State was as fully pledged to its completion; and the defendants are only doing what the Legislature

required to be done in execution of its existing policy, and which the faith of the State was pledged to carry out. Nor do we regard this extension as being within the inhibition of the complainants' charter. It is not a road from the eastern or southern boundary of the State. It is true that it is connected with, and has become a branch of the South-ern road, but such was not its original character, but is the accident arising from its having become the property of the State.

The whole legislation respecting it indicates that its south-ern terminus was regarded to be at the junction with the Southern road, as fully as its northern terminus was contem-plated to be at Jackson. It is argued, that the language employed in requiring this extension to be made, indicates that the Legislature apprehended that such extension might reach within the five mile prohibition. The requirement is that the branch shall be extended, constructed, and completed from Tecumseh by way of Clinton to the village of Jackson by way of Manchester, and *along the line of the* railroads formerly authorized to be constructed by the Jacksonburgh and Palmyra Railroad Company, or *so far along the same* as may not conflict with the provisions of the Act incorporating the complainant. Now, this language indicates that the Legislature required the branch to be extended to Jackson, and that such extension should follow a prescribed line, so far as it might, without interfering with the line of the Cen-tral road, and that when it would so interfere, a new line should be followed. The terminus was fixed, the line was contingent. That the Legislature had reason to apprehend such conflict of the designated lines, is apparent from the stipulated fact that the Jacksonburgh and Palmyra Railroad Company had surveyed and established the route of the road from Clinton northwardly to Jackson, but had not graded or built the same, and that between Michigan Centre and Jack-

son, the line so surveyed and established crossed, and for some portion of the way ran upon the track occupied by the Central road. Hence the design of the Legislature was to protect the track of the complainants' road from the intrusion of the defendant, and not to change the terminus, or to leave its location uncertain and contingent upon the will of the complainants.

The Legislature then required its completion, and that it should follow its established line so far as might be, without intruding upon the line of the Central road. Such completion of a road already in existence, partly constructed and operated, and the subject of sale by the State, must have been regarded by the Legislature as altogether different from the construction of a road from the eastern or southern boundary line of the State. If it were doubtful whether the branch could be extended to Jackson without the consent of the complainant*e*, the Legislature would hardly have peremptorily required its construction up to a point within five miles of that place, and then left it to terminate perhaps in a forest, or impassable swamp. We apprehend that such a doubt would have suggested · provisions respecting the possible northern terminus consistent with good sense and common prudence, and not such as would evidence gross ignorance or consummate folly.

It has been urged, that if this construction is given to the Act, the law might be evaded by a combination of companies, having ostensibly in view the building of roads between intermediate points, but in reality designing the construction of a continuous road extending to the prescribed limits on either hand. If such a case should arise, such a design *in fraudem legis* would clearly come within the jurisdiction of equity, and its protection would be afforded, unless other causes intervened to withhold it. But this is not such a case, unless indeed we can suppose that the Legislature intended to

perpetrate a fraud upon its own law, or was acting with the most wanton faithlessness towards the complainants.

As has been already intimated, the consequences of the interpretation of its charter asked for by the complainants, are such as to afford abundant evidence that the Legislature had no such intention as this claim indicates, and they are most assuredly such as should forbid the adoption of such a construction, except upon the requirement of the strict letter of the Act.   This branch connects with the line of the Southern road some five miles east from Adrian, and the Erie and Kalamazoo Railroad now also connects with the same road at Adrian.   By means of these connections, it appears that an uninterrupted communication by rail may be had from Jackson to the eastern and to the southern boundary lines of the State.   These connections, however, and these consequences, are only such as may follow from the construction of every road traversing the State in a northwardly or southwardly direction.   Should railroads be constructed from any points along the eastern coast of the State, north from Detroit, and extend westward, and these be approached by roads running traversely or diagonally to them, either by contract of parties or a simple change of transitus, a connection between the latter roads and the eastern boundary of the State might be established.   The interests of parties, as well as the demands of commerce, will secure these connections, and these diversions of trade as necessities arise, and as opportunities offer.   They may be made by contract (as is the case with the connection of the Erie and Kalamazoo Railroad with the defendants' road), or by an exchange of carriage from route to route, and by means over which the Legislature can have no control.   Is it possible that the Legislature had such connections and possibilities in view in framing the complainants' charter, and that it intended to prohibit them?   If so, we must conclude that its purpose

was to erect an impassable barrier between the northern and southern portions of the State, and to direct and mark out the channels of trade, regardless of the future necessities of the public; and in ignorance of the necessities of the ordinary laws of commerce. Nor can it with reason be urged that this view is without force, as the complainant will never refuse such approach from the north. Whatever may be the interests or purposes of the complainants, the question is of *power.* Did the Legislature design to invest this Company with such absolute control over the prosperity and welfare of the State, and over the courses of its trade? Was it its purpose to subject railroad intercommunication between the northern and southern sections to the mercy of any Corporation, or to prevent access to the Central road from either portion, if perchance a road running from the eastern boundary line should traverse it?

In no view of the case can we conclude that the Legislature designed any such consequences, or intended to inhibit the approach of any railroad to that of the complainants, except such as should, of itself, be entirely within the letter of the prohibition. Holding then, that the extension of this branch is not prohibited by the complainants' charter, and that, consequently, no consent is required to its construction, it follows that no franchise of the complainants is invaded, and no occasion exists for the consideration of the various other questions suggested upon the argument. Many of them are of great practical interest, and of daily increasing importance. That many of the views now held by our Courts respecting the character of these Corporations, and the nature of the grants to them, as also respecting Legislative power to grant that which was only delegated for use, will undergo great modifications, and some perhaps be entirely overturned, I have no doubt. But until the questions are distinctly presented, and their solution becomes essential to the judgment

The Michigan Central Railroad Co., complainant, *vs.* The Michigan Southern Railroad Co., defendants.

of the Court, it is scarcely proper to determine them, or indulge in what, after all, would be but judicial speculations.

The decree of the Court below must be reversed, and the bill dismissed with costs.*

COPELAND, BACON and JOHNSON, J. J., concurred.

PRATT, P. J., and GREEN, J., dissented.

WING, J., who heard the cause argued, resigned before it was decided.

DOUGLASS, J., did not participate, having decided the cause in the Court below.

---

* Since the foregoing case was decided, the case of The Boston and Lowell Railroad Corporation *vs.* The Salem and Lowell Railroad Co. and others (2 *Gray's R.*, 1), decided by the Supreme Court of Massachusetts, in October, 1854, has been reported. The charter of the complainants in that case, authorized them to construct a railroad from Boston to Lowell, and provided, "that no other railroad than the one hereby granted shall, within thirty years from and after the passing of this Act, be authorized to be made, leading from Boston, Charlestown, or Cambridge, to Lowell." Subsequently the Boston and Maine Railroad, the Salem and Lowell Railroad Co., and the Lowell and Lawrence Railroad Co., were chartered and constructed roads between termini designated in their respective charters. Neither of these railroads was within the foregoing inhibition of the complainants' charter. But the two first named of these Corporations, by the use and combinations of sections of their respective roads with a portion of the road of the last named Company, established a continuous line of transportation by railroad between Boston and Lowell. The complainants filed a bill to restrain them from so maintaining and using this line of communication. The Court (SHAW, C. J., delivering the opinion), held, that the foregoing provision of the complainants' charter constituted a contract by the Commonwealth with the complainants, that no other railroad from Boston, etc., to Lowell, should be lawfully made for thirty years, and was withint he Constitutional power of the Legislature to make, and binding upon their successors; that the exclusive right to such a railroad, conferred upon the complainants for thirty years, was subject, like other property, to be taken for public use, reasonable compensation being made, whenever, in the opinion of the Legislature, the public exigencies required it; but that an Act of the Legislature so appropriating it, under the power of eminent domain, must show by express words, or by necessary implication, the intention of the Legislature to exercise this power, and must be accompanied by provisions for making compensation to the owner; that no such intention to appropriate to public uses any of the rights of the complainants appeared from the legislation relied upon by the defendants; and, in conclusion, added: "We are also of the opinion that the several defendant Corporations,

The Michigan Central Railroad Co., complainants, *vs.* The Michigan Southern
Railroad Co., defendants.

having been incorporated and chartered to establish railroads between several
termini, according to their respective Acts of incorporation, have no right, by
the use and combination of several sections of their respective railroads, to es-
tablish a continuous and uninterrupted line of transportation by railroad, of
persons or property, between Lowell and Boston; and, that the actual estab-
lishment of such a continuous line of transportation by railroad, is substantially
making a railroad, other than that authorized to be made by the plaintiffs, to
their injury, and contrary to the rights conferred upon them by their charter."
An injunction was granted in accordance with the prayer of the bill.